The next case for argument is 22-1335, Schwendimann v. Stahls. Please proceed. May it please the Court. The formula books at issue here corroborate Jody's testimony. The Board found that an unwitnessed notebook cannot corroborate an inventor's testimony. But the cases actually say an unwitnessed notebook cannot corroborate an inventor's testimony without something more. That's something more. Do you have any case law to distinguish lab notebooks from formula books? You used the terminology formula books. And the reason we were making that distinction is in the cases where the Board is relying on the cases, where they say lab notebooks, those are like inventor diaries. Those are notebooks that were handed to the inventor that were the inventor's personal notebooks. The reason we were using formula books, one, is what they were called. But the fundamental distinction here is these notebooks were for the group. They were in the lab. People put their formulations and their observations in. They were dated for the most part. They were dated, but different people accessed the notebooks. They were kept there. And so it has all of the same. It has something more here, just like a witness signature is, because it was in a public place, because different people wrote on it, there's the same credibility you get for why it's not fake, why people can't go back and revise. You have with the formula book, because it's in a public location. Different people are writing in it. So the actual distinction you're drawing is really that there are multiple people writing in it? Yes, multiple people write in it with dates, and it's kept for the group. That's the distinction we're drawing. Because the case law that's being discussed really is for the board's decision exclusively inventor lab notebooks, where it's their personal diary, they're writing on it, and those were unwitnessed. And here, because the inventor notebooks are shared by the team, they included subsequent dated entries from different people. They provide the same kind of credibility that a witness signature would. They corroborate the sequence of timing. Just to close the loop on my original question, you don't have any case law that specifically distinguishes what you've described as formula books from lab notebooks? I don't, Your Honor. I do not. But again, the case law is clear that it's really the something more. And one thing everybody focuses in on is witness signatures. But as I said, because they were shared by a team, because they had subsequent dated entries, they provide the same type of credibility corroboration that a witnessed lab notebook would. And for that reason, the PTAB was free to question the weight that ought to be assigned to these documents, but the PTAB was not permitted to dismiss them categorically as if they were just an inventor author diary with no hallmarks or credibility. The other issue that I'll briefly address is the Board erred in holding the claims unpatentable over DeVries. DeVries used the word softening and not the word melting. Yet the PTAB read softening to mean melting, and there's no substantial evidence to support that reading. The PTAB only points to a phrase in the DeVries patent where DeVries explains that the relevant layer will, quote, soften and penetrate into the fabric. But as the evidence has shown, it can penetrate whether it softens or melts, and DeVries described it as softens. The Board picked melting because of Stahl's expert who so testified, but he offered no citation, he offered no explanation, and he offered no argument that melting would even work in the context of this invention. It's just a naked assertion. In fact, if the layer melted, then DeVries' solution wouldn't work. I'm happy to talk about that, but for now, all I need to show you is there's no substantial evidence to support the Board's conclusion. It's simply a naked argument, and that means you must remand. And just to be clear, DeVries himself knew how to make this distinction. He described another layer in his invention as, quote, molten, which tells you he knew the difference between soften and melt. Finally, Stahls will argue that our expert, Ellison, testified that DeVries disclosed melting, but Stahls knows that our expert was using a definition of melting that included softening. They know it because it's explicit in his deposition transcript. So Stahls' presentation of that issue to this panel is at best misleading. In Ellison's expert report, using the definition of melting from the claim construction, Ellison made clear that DeVries does not disclose melting. Unless you have other questions, I'm done. Thank you. Can I please report, Your Honor? Glenn Forbes for Stahls. So on the first issue of corroboration, when an inventor tries to swear behind a reference, right, you have to have independent corroboration of that testimony. And the law is very clear that independent corroboration can't include the inventor's own unwitnessed documents alone. And that's what we have here. The board made a finding of fact that the formula books were, in fact, not independent evidence. Why was that? The board pointed to the fact that the formula books were maintained by, stored by, and ultimately produced in the litigation by Ms. Schwendeman. No other witness in the entire proceeding testified about the formula books. Only Ms. Schwendeman. Not a single page in the formula books was witnessed. So what are we left with? Counsel says, well, these have hallmarks of reliability because multiple people wrote in them. Well, there's two problems with that. The first problem is that Ms. Schwendeman, when she did testify about these formula books, couldn't identify who wrote on which pages, who wrote where, or even what pages she wrote on. And the board was quite clear to point that out. The second problem with that is that Ms. Schwendeman's testimony alone is insufficient legally to explain that very point because it's her testimony. She can't explain the very evidence that she's relying upon to corroborate her own testimony.  Do you agree with your adversary's characterization of the board's decision as categorically rejecting the books? I don't, Your Honor. As insufficient? No, I don't, Your Honor. The board looked at a couple of things. Are these lab notebooks that have been witnessed the board found as a factual matter or not? Then the board went on to say that these are not independent evidence either. So the board kind of took it in two steps. And so the board considered whether or not the lab notebooks, the formula books, whatever you want to call them, would be considered independent evidence. And that's when the board looked at where were these books kept? Who kept them? Who wrote in them? Can we even identify a page when somebody wrote on them that we can put a name to? And the answer was no to all of that. So in the briefing, counsel said this is really a case of first impression. And Your Honor asked is there any case law on this. In fact, there is case law on this that really kind of gets to all fours. It's the Medi-Chem case. It's at 437 F. 3rd 1157 at pages 1172 to 1173. And this is a case that was actually cited by counsel for Ms. Schwendeman. And in that case, an inventor purporting to try to swear behind prior art in claim of earlier filing date had her own lab notebook. Nothing was witnessed. And so the court said that lab notebook can't, as a matter of law, corroborate your testimony. But the inventor also tried to introduce a second lab book, a lab book of a non-inventor. And that's effectively what we have being argued here is that this lab book is the formula books are lab books of non-inventors because it's the inventors and Ms. Schwendeman writing in it. And so in the Medi-Chem case, the inventor tried to introduce the lab notebooks of a non-inventor. And the testimony was that both the non-inventor and the inventor wrote in that other lab book. And so what the Federal Circuit said is that those pages on which the inventor wrote couldn't corroborate her testimony because they're her writings. The pages on which a non-inventor wrote, to the extent they had any corroborative evidence whatsoever, they could not rely upon the inventor's testimony to tell them which pages the non-inventors wrote on versus the inventors, which is exactly what we have here. Because in Medi-Chem, like here, nobody testified about the non-inventor's book other than the inventor. So the Medi-Chem case is really on all fours here. Now, all of these findings, that alone is substantial evidence to support the Board's finding that the formula books do not corroborate Ms. Schwendeman's testimony. But this is against the backdrop of an ever-changing story from Ms. Schwendeman about her invention. Starting in 2008, the first litigation she ever had about the case, when she testified under oath that the whole invention was made in August of 1999. And she explained why she remembered it, because it was at a meeting in a conference room with her client waiting for a solution, and she came up with the idea. Six years later, she's in an interference, and that date changes from August of 1999, gets moved back to 1996, and the formula books, for the first time ever, make an appearance. She's in litigation three years later in 2017, and she reaffirms this story, that she has this epiphany in August of 1999 about how to make the Peel First methodology work, and that's when she invented that, but she still relies upon the lab books for 1996 for the actual apparatus for the pieces of the material. We get into the IPRs here in 2021, she files declarations saying, everything in my lab books, that was Peel Last. They write it in the brief. Two months after her declaration, I take her deposition, and for the first time ever, she says, oh no, back in 1996 and 1987, I did all that Peel First stuff. So against that backdrop of an ever-changing story, that's unreliable. You don't have corroboration here, and the board properly found that there was substantial evidence to find that it wasn't corroborated. Her changing story, or whatever you want to call it, doesn't tell us anything for sure about the veracity of the formula books. Formula books exist, and there's writing in them, right? The formula books exist, and there is writing in them. And there are signatures, so we know that we may not know who they are because we can't read the signature. Is there a problem of not knowing the name of the people? There's very much a problem. We don't know who those signatures are. My point is, your litany of Ms. Jody, if we can call her that, memory lapses to me is not really pertinent to us deciding the core of the, I mean, I understand why you're doing it, but people do have faulty memories. So we have in front of us a document, a formula book, right? And the question is, and we have her testimony, does it corroborate? Right. It's unlike, it's not hers, all of hers. In fact, she hasn't written in any of it, has she? No, we don't know that. She said that she wrote some, other people wrote some, and she can't tell which one is hers and which one is theirs, whoever that might be. There's no question that she said that she wrote in the book herself as well. She's the inventor after all, right? And so what you do is have a couple of people. So you basically have an open book, sort of like a complaint box, and people who are working on the project make writings in it. That is the testimony. Again, but we only know that because Ms. Schwendeman testified about it, and she's an interested, she's obviously the inventor. So I would submit that the law doesn't permit you to even rely upon her testimony for that fact. Well, the board didn't find her incredible, right? The board what? Didn't find her incredible. They didn't say we can't believe anything she says because she changes her mind. No, what they did say, though, is that because of the changing testimony, that this is a hallmark case for why corroboration is necessary. And it's not only because you have formulas in the book. So you have the books and you have different people writing in them because we know that the handwriting is different and apparently the signature is different. So we don't know the who. Right. And you only have a couple, that's true, and you only have a couple of the samples where you have a signature at all. Many of them have no signature. And counsel, Ms. Schwendeman has not even identified, this is the page, this is the one that corroborates my testimony so that we can even zero in on, does that particular page have a signature, right? Or who might that be that has a signature? So it's just faulty evidence in total. And the other reason that this is important and her changing testimony is important is because we're not only talking about claims directed to the sheet. We're talking about method claims as well, right? And so there's two things. When you look at this formula book, you can't tell, you can't look at it. They don't line up one for one with the claim. You have to do an interpretation of the formula book. And the only person that does the interpretation of the formula book to tell us what the formula book means is Ms. Schwendeman. She's the one who says, if you look at this line in the formula book, this is an interceptive layer. This line in the book is a white layer. This is melt and mix. This is why we must have done it with Teal first. She's the only one that testifies about that. So there isn't a formula book that says that you can lay, besides the claim, one for one and say it corroborates her testimony. You need the interpretation. And nobody does that other than her. And I do want to make the point, too, that all this changing testimony is particularly suspect, right, because when she filed the first patent application, September 9th of 1999, it didn't have anything about Teal first methodology. It didn't have anything in there about melt and mix. So it's all suspect for those reasons. And so the bottom line is, with all of that background, I think that the board clearly had substantial evidence to find that the lab notebooks, formula books, whatever you want to call them, were insufficient independent evidence to corroborate Ms. Lindeman's testimony. So the second point is DeVries. And DeVries, there's only one issue. DeVries has a polymeric layer that is shown to be pressed against a shirt and heat applied, and DeVries says that, teaches explicitly that, that polymeric layer penetrates into the shirt. And so the only question is, did the board have substantial evidence to conclude that the teaching of the polymeric layer penetrating into the shirt taught a person of ordinary skill in the art that that polymeric layer melted? That's the only question. And the answer to that is there's substantial evidence to support the board's conclusion that it did. That substantial evidence is threefold. Dr. Scott's testimony, he explicitly said that the polymeric layer in DeVries must melt in order to perform the function of bonding that layer to the shirt. And so DeVries specifically says when that material penetrates the shirt, its purpose is to bond to the shirt. Dr. Scott said if it's going to bond to the shirt, it needs to melt first. Ms. Schwendeman actually confirms that in her testimony. Ms. Schwendeman testified that when I asked her in deposition, why does the layer need to melt? Why does the white layer need to melt in your invention? She says to hold it to the shirt. The second piece of evidence is Dr. Ellison's testimony himself. And it holds it to the shirt because it penetrates. Because it penetrates, that's correct. And to penetrate, it needs to melt. That's correct. And that's the testimony of Dr. Scott. And that's the same testimony of their expert, Dr. Ellison. When I asked him in his deposition specifically, I said, and for it to meld into the fabric, for the polymeric layer to meld into the fabric, for it to go into the fabric, doesn't the polymeric layer 22 have to melt first? And he answered, yes. And I followed it up and I said, so the heat is applied, the polymeric layer 22 melts, moves into the fabric, and then if cross-link is used, cross-linking occurred at that point after the melting process, correct? And his answer, Dr. Ellison's answer was yes. So you have both experts in agreement. And this argument about, well, he was using a different definition of melt that includes soften, look at the brief, two days later he was asked in the same deposition, it was a continuation of the same deposition, he was asked by his own counsel, when you testified about the prior art, what definition of melt were you using? And he said it did not include softening. And that was explicit. And the last thing, the last piece of evidence on this point is the following. Ms. Schwendemann's own test for whether the layers melted was the observation of the final product. So when she testified about how did she know her products melted when she did all of her samples back in the 90s? Her answer was, well, because they had softness. And you heard that in the previous argument. Good washability, good bonding. That's the only reason that she knew. That was the test that she applied to her own products. Well, when you look at DeVries, he has exactly the same results. Multiple times in DeVries, and we've cited him in the brief, he says, and I'll quote one of them, he says, virtually all of the polymer was embedded between the fibers of the patent thread. The hand of the material was soft before and after washing. Wearability of the transferred image was judged to be good. I'm sorry, washability of the transferred image was judged to be good. And I've cited a number of places, four or five places where that's cited. So all of that evidence goes to the fact that penetrating, a person already skilled in art would understand penetrating to require melting. Thank you. Thank you. I just have a couple of points. On the Medicam case, you can look at the case yourself. It's all personal lab notebooks that each inventor kept. It's not a group lab notebook like the one that we're talking about here. And the main distinction, and it's a factual distinction I'm making, is here, and the testimony came out this way, Jody or the co-inventor might have told somebody at the lab to do a certain formula. They did the formula. They wrote it into the book. When they did the testing, they wrote the results into the book. And then they were dated. Generally, some of them are initial, but you can see from the different handwriting, it's self-authenticating in that you can see different people have written it. It's a fair inference from that book. You don't need any more testimony. In terms of explaining the formula, yeah, she explained them. But that's the main reason. That's the fundamental difference is it's a book where, because of the way it was kept and the way it's written, the reasons that you have for witness signatures are implied in that context. Separately, in terms of this Peel First, this method thing, I just want to be clear. Her testimony has always, whichever her testimony has always been, she invented that method by August of 99. But all of that predates Williams, no matter what. And at her deposition, when counsel showed her more entries, it came back to her. And that's all that happened there. And lastly, on DeVries, the Board's entire basis is that phrase, soften and penetrate, that's from DeVries. And the question really is, was there substantial evidence to define soften as being melting when the claim construction excludes softening? And so that's all you're looking at. And if you look at Scott's declaration, you'll see that it's a naked assertion. There is no analysis for why you would take and change the word softening there to mean melting. Because Ellison even says if it softens, you can still penetrate. But there's no explanation, and that's the reason it's a naked assertion. That's all I have. Thank you. Thank you. The case is submitted.